And we'll take a short recess after the first case to rearrange the panel. So the first case is No. 17-1362, PPC Broadband v. Iancu. Mr. Jakes. Good afternoon, and may it please the Court. The Board made two fundamental errors here on remand. The first was not following this Court's claim construction on the maintained continuity limitations. There are no findings. What's the basis for that? I've read the Board's decision. Yes. Where do they do that? Where do they fail to follow the claim construction? Well, first of all, the claim construction requires consistent or continuous contact. The Board has to say where that consistent or continuous contact is. The only place where the Board actually uses those words is in describing the continuity member and saying, that's not required. They have to make findings that actually support it and explain it. But that's not the question. Where do they say they're not following the claim construction? They describe both of the claim constructions, the continuity member and the maintaining construction, and they appear to be following the maintaining construction. Where do they say they're not? Your Honor, I'm not saying they expressly say, we're not following it. But they didn't. You'd have to look at what they actually did. And did they make the findings that there was continuous or consistent contact? And they did not make those findings. And as I said, the only place they used those words were in describing the continuity member and saying, that's not required. Something more is necessary here. Even if the Board had made those findings, which there aren't, those findings do not exist, there's not substantial evidence to support it. The expert, Corning's expert, from his declaration, his six declarations that he submitted, those were all done before this claim construction. He doesn't say continuous or consistent contact. At his deposition, when expressly asked, how does this Tatsuzuki reference show constant contact, he said, no, it doesn't. It shows it being accommodated in the group. So there is no evidence to support that. The Board didn't make those findings because there wasn't anything to support it. And when you look at the Board, what the Board actually said, the Board said this disc-shaped spring would make contact and it would maintain it. They say on page 23, it says, we now make explicit findings as to how the combination of Matthews and Tatsuzuki teaches to maintain electrical continuity limitation. I agree, Your Honor. I don't feel like thumbing in the nose of the claim construction. They do not cite the words of the claim construction and explain consistent or continuous contact. Is it really your debate, not with what they recite in terms of what they say the claim construction is, but with the fact that they didn't, or that you think they didn't really apply it properly? They didn't apply it properly. They didn't make the findings that would be necessary, that there is consistent or continuous contact. If you look at what the Board actually said, it said the spring would make contact. That's the same construction of the continuity member. And they say it would maintain an electrical connection. That's the same construction of the continuity member, which doesn't require consistent or continuous contact. Something more is needed here if the Board is going to make those findings. And even if they had, there is not substantial evidence of this consistent or continuous contact. What about the press fit? Sure, the press fit. Well, of course now the Board's opinion says nothing about press fitting. It's not in there. So there is no finding that the Tatsuzuki spring could be somehow press fit onto the post. So the Board can't be sustained on a ground that they didn't actually put in their opinion. But let's assume that there was a finding on that. Again, it's not supported by substantial evidence. There's nothing in the references that talks about press fitting. The only discussion of press fitting is in the patentee's specification, and that can't be used as the roadmap. So there is no press fitting. Then you look at what Corning's expert said. He said it doesn't teach how tightly the spring fits around the post. The Patent Office agrees with that in their brief. It says the reference doesn't show how snugly it is around the post. It doesn't show that it's tight, loose. Then the expert says he doesn't know how thin a thin spring is. Well, he says that someone skilled in the art would know how to get a tight connection, right? Well, to make a connection. That's still not saying press fitting to make consistent or continuous contact. That's reading a lot into it. And if you look at what he actually said, he said he doesn't know how thin it is, and without knowing the thickness, he wouldn't know whether anybody could make a press fit. So when you look at the total of his testimony, simply repeating the claim limitation and saying it's in there, that's not enough. So are you saying that the board had to use the words press fit in their opinion? Because they do discredit his testimony, and his testimony included the press fit theory. Oh, I would think they would have to, Your Honor. The board has to articulate its reasons. It can't just say the limitation is met. It has to explain why, and especially where we have an actual construction of what that limitation means. Why would it be consistent or continuous? Why would this press fitting actually do that? It's not taught in the references. It's just some technique that everyone would know. And then the only place it's taught is in the patent owner's specification. And then you look at what he actually said, and you say, well, it depends on how thick it is. It says thin, I don't know how thick it is, how thin it is. I don't know whether anybody would be actually able to do it. So there really isn't substantial evidence to support the press fitting, whether the board said it or not. I don't think he said, I don't know whether anybody would be able to do it. He said that somebody could do it. And he says you might have to adjust the thickness to do it. He did say it's not defined what thin is in the reference. He did say, I don't know what thin is. And then he said, in the absence of knowing anything about the thickness of the ring, I don't think anyone would know the answer to that. For an expert, that's a pretty big admission. That's not equivocal. That's saying without knowing those details that are not in the references that someone wouldn't know how to do it. I could also address the objective evidence. We think the board failed here as well, both on the commercial success and Corning's failed attempts. This is a strong commercial success case. We have sales that went from nothing to a dominant share in the market while charging a premium price. And the board did everything possible to try to say, well, you didn't explain this, you didn't explain this. First of all, it wasn't PPC's burden. We submitted the evidence. There was nothing that required PPC to discount every other possibility that the board could come up with. This court in the first decision did instruct the board that the evidence of commercial success couldn't be ignored simply solely because there was another product PPC had sold. And if you really look what the board did here, they effectively rely on that earlier product for all the reasons to discount commercial success. One, they say the sales didn't reach quite as high. Well, that's not actually factually true. That's just how far the data went. We don't know beyond 2013. So saying that's a peak is really not accurate. The board pointed out a weakness in that your declarant didn't describe the relative market size between 2010 and 2013. And you're saying nobody knows what the relative market size is between those two time frames? The overall sales are there. It's in the $180 million to $200 million. The overall market share is there. It achieved 85% when you combine both PPC sales and Corning sales, which were found to be a copy. I'm not sure what else we were required to do. They say PPC transitioned the sales. Well, that's true. Salespeople sell. They sell based on the advantages. The advantages were the advantages of the patented invention. It works better. They charge 16% more. But this is a fact-finding, and the government seems like it properly considered the fact-finding. And, I mean, you just don't agree with their conclusion that PPC's sales, and the reason it looks successful is because it took all the sales away from its own other alternative unclaimed connector. It's a fact-finding. What am I going to do with that on appeal? Well, that is a fact as to what happened. The effect of that on obviousness, ultimately, can be weighed as part of a legal conclusion. Wait, are you suggesting that you want me to adopt a rule of law that says if you have an unpatented component that you're selling, and you come out with a new patented component, and you just take the sales from your unpatented component, that you therefore have commercial success for the patented components? No, Your Honor. I think you'd have to always look at the entire factual situation. But we have more here. We have a 16% price premium, for one thing. It wasn't like the prices were dropped. It was a one-for-one substitute. And you think that 16% price premium is sufficient for me to find there's no substantial evidence for the PTO's finding that there isn't commercial success? Well, I think all the evidence points... Or that the commercial success isn't attributed to the claimed components. Right, I think all the evidence points to commercial success due to the invention. It was the way it was sold. Take a look at PPC's brochures. This feature is touted in there. There really isn't any evidence on the other side. It's only speculation as to what might have caused it. Corning didn't submit that evidence. And given on this record, I don't see how there could be a finding that there wasn't commercial success. And similarly, for Corning's failed attempts, this Court said there was substantial evidence supporting the Board's finding. It also said that this weighs in favor of non-obviousness. The Board didn't say that on remand. It just said it took note of its earlier findings where it said this didn't establish anything. And so we think the Board erred in that as well. When you look at all this evidence, there is strong evidence of this objective evidence of non-obviousness. You look at the fact that this limitation is still missing. There is no finding of continuous or consistent contact. This Board should... This Board's decision really isn't supportive. And so we ask the Court to reverse. Okay. Thank you. Thank you, Judge. You've saved the rest of your time for rebuttal. Ms. Lowe? Before you get into the parents of this case, this appears to be another partial institution post-SAS case. Has any party, to your knowledge, asked for any post-SAS remand for a full institution by the agency? In this case or in any other case? No, not in this case. Sorry, Your Honor. I just wanted to make sure I didn't understand. Not to my knowledge. Because this is another partial institution case. We went back and took a look. Yes, Your Honor. They have not, PPC has not asked, Corning has not asked. I wouldn't think they'd want it necessarily. Corning settled out, right? The PTO doesn't want this back, I assume. I think the PTO would be very happy if the Court affirmed this case. Well, just out of curiosity, if we don't affirm in vacating remand, it's still the same IPR. Would the agency's position then be that since it's the same IPR, and there are, in fact, other grounds and other claims that weren't addressed, that it now needs to go back and do it properly according to the current guidelines? You know, Your Honor, I'd have to get back to you on that one. I'm not sure what the agency's position is on that. I'd be happy to, if you'd like. But this is an issue. You'll cross the bridge when you come to it, if you come to it. Okay. Should I move on to merits now? I would say here this case presents very strong evidence of obviousness. Matthews almost anticipates. If the O-ring continuity member in Matthews were just a little bit smaller so that it touched the post instead of the body, we would have an anticipation here. Satotsuki fills that gap. It teaches and suggests to one of ordinary skill in the art to have the continuity member ring touch the post. Dr. Murakowski, Dr. Corning's expert, explicitly testified that one would want to do that in order to But all he said was that you could press fit, and I didn't really understand completely what he was talking about, but to press fit, and you could create this electrical connection. But there's nothing in his testimony that talks about any kind of continuity to that electrical connection. I mean, it does seem like the board wanted to go back to its original claim construction that we found to be not reasonable. Your Honor, I guess to unpack that question, there's a lot of focus by PPC on the words continuity in the original claim construction by this court. If you look at the claim construction, the words that are most often repeated are maintain electrical continuity during certain specified periods of operation. That's in there five or six times, and the continuity is only in there once. For example, the key paragraph starting at the construction is These limitations require the continuity member maintain electrical continuity during certain specified periods of operation of the connector, and it's over and over again in the opinion. Meaning one moment. The connection is not enough. Well, during the specified period. So the whole point of this is when the nut isn't tight on the post, that the connection is still maintained. Right, but the board originally said it could just be intermittent. Just come back and touch the post whenever. And we said no. In fact, we said under Phillips, it should be completely continuous throughout. But even giving you the benefit of the broadest reasonable construction, which we had to do, we said there still has to be some form of continuity. And what I'm trying to understand is where the board actually, where the evidence is that it was more than just a moment of connection versus continuity throughout. Well, the during specified periods of operation is a temporal continuous limitation. So it's not just a moment. If it's during the times when the post isn't, when the nut is loose or when it isn't tight, that's the continuity during those times, a continuous amount of continuity. So where the board found that, I mean, I'm not sure if Your Honor agrees that the board believed that that was the claim construction, but it did state it was, and it stated it several times in the construction. For example, earlier on in the opinion, on page 12, it states, the Federal Circuit explained that several claims do require such temporal continuity. So we're talking about over time. It understood that. But it doesn't really define what temporal period it was finding continuity through this Prescott theory that it never mentioned. Well, if you look at the, for example, on page 825, it states the time period. It states that in sort of the middle of the paragraph, when it's making the findings here, that we are satisfied that it establishes a continuity member poised to make contact that would maintain electrical connection between the post and the nut during specified periods of operation of the cable connectors, such as when it's tightened partially or fully. So it explicitly says that in its opinion, that it's during those times, which is really the language that the court used most frequently in its own claim construction. I guess I'm going back to what evidence supports that conclusion. Try as I might, I can't find it. So I'd say three items of evidence. First, the board points to the sketch that Dr. Murakowski made during his depositions and states we're relying on the sketch that depicts his opinion. So the sketch is depicting all the things he's saying. And they state we also credit Dr. Murakowski's testimony on this issue. So what's the testimony? First of all, looking at figure 3 of Tatsutsuki, the ring is touching the post. There's nothing to suggest it's not continuous. But going specifically to the issue it is, Dr. Murakowski over and over said you would want to do that. You would want it to touch the post continuously. You would want it to do that, among other things, so when you're assembling it, it doesn't fall off. For example, on page, this sketch that the board has in its opinion is Exhibit 2007. So if you look at, for example, Appendix 2267 to 2268, the expert was asked, in the connector that you used, as shown in Exhibit 2007, how would the Tatsutsuki continuity member be assembled onto the post? He says, in the embodiment that was shown here, the continuity member would be press-fit onto the post. And that's one of the times he says it, but he says it over and over again. And this time he specifically says it based on this same sketch, that this Exhibit 2007, the continuity member would be press-fit on the post. But the board never says that it's relying on his press-fit here. Well, it says we credit Dr. Murakowski's testimony on this issue. It reprints the picture. Well, doesn't that create a new basic problem for you? I mean, they need to explain what they're doing. And that's a basic APA principle. I would say the board's path here is reasonably discernible, because it says, here's the sketch. This was the sketch he made in his deposition. It depicts his opinion, and we rely on his testimony. They didn't cite every line where he said this. He did say this in numerous places. Here's part of your problem, from a technical standpoint, it seems to me, with this argument. I mean, not only did the board never mention press-fit. It did say we also credit Dr. Murakowski's testimony on this issue, particularly his statement that Corning's proposed combination would maintain electrical continuity. I'm not sure that paragraph 93, which they cite, even lines up with the press-fit argument exactly. But even if it did, the board never mentioned press-fit, and PPC put evidence in the record that there would be a problem press-fitting Tatsuki because of the thinness of the continuity member, that it would be inoperable. It would break. They had their own expert testimony. So the board never mentions press-fit, and it never responds to, and Dr. Murakowski never responded to that PPC evidence, that the press-fit with the Tatsuki continuity member wouldn't work. It seems to be too thin. We're not sure it would work at all. It seems like it wouldn't. That's what their expert said. And Murakowski didn't respond to that. And the board just never mentions any of this. It never addresses any of these arguments. Isn't that an APA problem? I mean, as Judge O'Malley said, the board, maybe I could forgive you for not mentioning the words press-fit if you actually cited then the right part of his testimony, which you don't. But then when the other side has all these arguments about why press-fit is wrong and the board doesn't address those either, isn't that a problem? I mean, at some point, isn't there an APA obligation to address the arguments made? I think an opinion would have been stronger if they had addressed press-fit expressly. No, isn't there an APA obligation to address the arguments they made? There absolutely is. And by putting the sketch in that they say depicts the opinion, that's their shorthand for saying— But Murakowski didn't address in his testimony anywhere the problems they identified with press-fitting the Tatsuki continuity member. His testimony never addresses it. So adopting his testimony is not responding to their argument. Well, there were a couple points that you made in there. He does address, for example, the thinness question. They were questioning him on can you do this? If it's thin, how thin can it be? What are the lower limits of how thin it can be? What are the exact dimensions that it has to be? And didn't he say something like I wouldn't know how to answer the questions unless I knew the exact dimensions or something? He did say that, but he also said, and I'm going to quote here, I'm sure that there are dimensions of the Tatsuzuki continuity member that could be press-fit onto the post. So he says, I'm sure there are dimensions that you could do it. But he didn't just say, I'm sure there are. He didn't give any evidence. He said, I have no idea what the lower limit of those dimensions would be. It's sort of like saying, look, I know that you could use a screw to connect the table leg to the tabletop. I don't know sitting here what's the thinnest screw that you could use or exactly what the dimensions of the pilot hole are. I can't tell you that, but I know you can do it, which is what basically he said. But he didn't provide any testimony with respect to time frames and over particular time frames. And the board never cited, in its opinion, the time frames over which it believed that there was continuous connection. He did in his declaration state the time frames because he went through each limit, and the limits, some of the dependent claims and actually some of the independent claims include those limits that it has to be including while the nut is loose or it's not fully tightened onto the post. So he does that there. He says, during those times, you would still maintain the electrical connection. But this is the exact same testimony that the board relied on when the board said, all you need is intermittent connection. And then they said, his testimony shows intermittent connection. And then we go back, and we've got a new claim construction, and they said, oh, voila, now his testimony shows something else. Well, if it needs more, right? So the last claim construction was it didn't have to. The same evidence can show, OK, it doesn't have to, but it does. And it has to, and it does. And that's what it does here. OK, maybe it didn't have to, but it still showed it. Here on the inoperability, going back to Judge Moore's point too, first of all, that is something that's waived here. This was in a footnote in PPC's brief. And that is not preserved. Arguments that are incorporated by reference in a footnote are not preserved for appeal. But even if the court reaches it, looking at the reference on its own and looking at Dr. Eldridge's- Is there precedent that you're aware of that says if an argument is made in the footnote, it's not made? Well, they incorporated- I think there actually is a case on that point, but this is certainly a different issue. They incorporated by reference seven pages of their brief in the footnote to make that argument. And there is precedent that we cited saying that that's not permissible. I can pull the exact case name, but it's cited in our brief that you cannot incorporate pages from an appendix, which is what they did, in your brief and make your argument in that way. Well, to do so would allow you to override the word count, right? For briefs. I think that's part of the reason. I certainly think that's part of the reason that you can't do it. But even if you get to the argument, looking at Dr. Eldridge's opinion in itself, he just says, first of all, they say that they're no longer arguing teaching away. They're no longer arguing it's inconsistent with the basic purpose of the reference. Now they're just saying, okay, fundamentally change and make it inoperable. So they're saying, forget about the other two. We argued below. We're not arguing those. If you look at Dr. Eldridge's opinion, he's just saying- he says that the function of the tatsuzuki continuity member is to be biased between the nut and the body, this way. And this is where the springiness is. It's a flat ring that's up here with the springs facing the nut. He says that's what the function is. You can still do that, whether or not the ring is around the post tightly or loosely. He's making up that-he says that it needs to float. He said it needs to be loose on the post. He doesn't ever say why. And they don't point, in their brief, to why that is. Why does it need to? It shouldn't need to. It's still biased. It's still biased between it sitting there and pushing against the post and the body-excuse me, not the post and the body, the nut and the body, whether or not it's loose on the post. He never explains that. That opinion is conclusory, at least I would argue, because it doesn't say anything about why you would need- why it wouldn't work. It would still work just fine to be pressed between the body and the nut if it's tight around the post. It's like, you know, my-it's really not-also just pulling back the question of whether- it's really all well and good. But that's not the board's fact finding, because the board didn't make any fact findings about how it would work. That's the problem. They made arguments it wouldn't. You telling me you personally believe it would, it doesn't help the board. Right. And the board did not even discuss any of this testimony. So, I mean, you can tell us what you think this testimony showed, but the board never even mentioned it. And we've said repeatedly that you have to consider all evidence of record, including that that cuts against the board's ultimate conclusion. They relied on Dr. Morkowski's testimony. I understand Ernest's point that he didn't specifically address this Dr. Eldering point. But that is the-that's sort of a rebuttal point, really. That's the inoperability point, not the initial prima facie case of evidence-of obviousness point. And he does give very strong evidence about that, and they do incorporate his testimony on that point. You know, he over and over again in his deposition, he says, it can be done, it can be done, it can be done. You would want it to be done, not just that it could be done. You would want it to be done. And just stepping back, even if you didn't have Dr. Morkowski's testimony at all, this really boils down to a question of, would one of skill and the art understand that when you have two contact points, when you have contact points, you would want a ring to be on the post pretty snugly. It's not hard. My child's-the child's stacking ring toy, those are press fit onto the post. My ring is, I'll tell you, it's press fit onto my finger. It's not something that is hard for one of ordinary skill and the art to undertake. And that is what Dr. Morkowski testified. Should I move to commercial success? Or does this- Well, unless there's some questions, we're out of time. Do we have any questions? No? Thank you. I'd like to address the point, if this case does get remanded and the rules have changed, we would be seeking to re-examine those claims that have already been disallowed. Changing the rules while the proceeding is going on is something that we are interested in. I think it's one thing that counsel- Wait, wait. You haven't raised before this question of a remand on the additional raffles, right? No, Your Honor, I have not. I'm just saying that if this case continues back in the Patent Office, as Judge Mora was asking, we're not interested in the partial institution question, but if there are changes and the IPR is still pending, then if the Patent Office has changed its rules, we would seek to- What's the likelihood that there would even be any further proceedings if Corning is out? Well, that may be. That may be, Your Honor. One thing counsel said is that the ring touches the post. That's really the problem here. Touches the post is the old construction. This court said maintaining electrical continuity requires consistent or continuous contact, period. That's the claim construction and the part that we're focusing on. During specified time periods, the temporal part of it- Temporal doesn't mean temporary, because if you look at the claim, say claim one of the 060 patent, it requires to maintain continuity when the nut is tightened and when it's partially tightened. There's not really anything else. It has to work when it's in use, so that doesn't mean temporary. It means maintain throughout those periods. So we get to the sketch. Corning's expert said it corresponded to his declarations. He doesn't mention press fit in his declarations. He did discuss it at his deposition. That drawing, which he said corresponds to his declarations, is not necessarily press fit, and to try and then to say the board found something about press fit, that's a pretty big stretch. The Tatsuzuki spring, it has to spring. It wouldn't be press fit onto the post. That was their argument. What did he say about press fit, though, in his deposition testimony as opposed to his declaration? He said a lot of things. He said that it was a known technique, that you could use it, but then when asked does Tatsuzuki show press fitting, he said no, it doesn't. He said that... It doesn't have to show it, right? As long as someone skilled in the art would know how to do it. Your Honor, then we're getting beyond the teachings of the prior art. We're just getting to what this expert said, and usually you need some teaching, and the only teaching here is in the patent owner's specification about press fitting. I'll concede that press fitting is a technique that is known. Why you would use it in this situation without something in the prior art to suggest it is where the real problem is. What's more, Mr. Jakes, isn't it the case that the patent office, when they addressed this issue on appendix page 25, only cited to his declaration, which doesn't disclose press fitting, and they never cited to his deposition testimony, claiming to be relying on that testimony. You're exactly right, Your Honor. So to the extent that the board articulated a basis for its conclusion, that basis was found only in his declaration, so that's the only evidence from Murkowski they cited. That's right. And we did not address press fitting head on in our opening brief, but when the patent office responded and said, oh, press fitting is the substantial evidence, we addressed it in our brief. Thank you. Okay. We thank both counsel. The case is submitted, and we will take a short recess. All rise. Your Honor, we'll call for a short recess. Thank you.  I got my e-mail. Good. Thank you. I know I was watching. Oh, you were? You got the e-mail? Yeah. Oh, my gosh. This is just for us? Yeah. The one that's getting ready to come up? Yeah. Okay. Excuse me, everybody. We have a motion to adjourn. Second? Second. So moved. Second? Second. All in favor. Aye. Aye. All opposed. You're adjourned. Thank you. Second? Second. All in favor.  All opposed. Second? rise.